_____
                                )
**FIELDING McGEHEE, III,**       )
**REBECCA MOORE,**               )
                                )
      **PlaintiffS,**   )
                                )
   **v.**                      )     **Civil Action No. 01-1872 (GK)**
                                )
**UNITED STATES DEPARTMENT**     )
**OF JUSTICE,**                  )
                                )
     **Defendant.**     )
_____ )

## MEMORANDUM OPINION

Plaintiffs Fielding McGehee, III and Rebecca Moore bring this action against Defendant, the United States Department of Justice ("DOJ"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Plaintiffs seek documents in the possession of the Federal Bureau of Investigation concerning the victims and investigations of the Jonestown Massacre, which occurred in Jonestown, Guyana, on November 18, 1978. This matter is before the Court on Defendant's Second Motion for Summary Judgment [Dkt. No. 126] and Plaintiffs' Second Cross-Motion for Summary Judgment [Dkt. No. 132]. Upon consideration of the Motions, Oppositions, Replies, and the entire record herein, and for the reasons set forth below, Defendant's Motion for Summary Judgment is **granted in part** and **denied in part** and Plaintiffs' Motion for Summary Judgment is **granted in part** and **denied in part**.

## I.    BACKGROUND[1]

Plaintiffs are a husband and wife "journalistic and academic team," who operate a website containing information on the Jonestown Massacre. This case concerns Plaintiffs' efforts to uncover the names of the victims of the massacre and to obtain other information about the FBI and CIA's investigation into the Peoples Temple Christian Church ("Peoples Temple") and its leader, Jim Jones. On the day of the Massacre, a member of the Peoples Temple assassinated California Congressman Leo J. Ryan at an airstrip in Port Kaituma, near Jonestown, Guyana. Later that day, nine hundred and thirteen members of the Peoples Temple died in a mass suicide at Jonestown.

On October 6, 1998, Plaintiff McGehee submitted a FOIA request for "a copy of all lists of the people who died in Jonestown, Guyana on November 18, 1978." By letter dated November 23, 1998, the FBI notified McGehee that the results of his FOIA request consisted of 48,738 pages. On December 11, 1998, McGehee responded that he wished to limit the scope of his request "to cover the 251 pages on Peoples Temple membership which [Mr. Phil Waltz] identified during a cursory review of the Peoples Temple records in the FBI's larger collection of materials." Def.'s Opp'n, Ex. D, at 1 [Dkt. No. 142-1]. McGehee stated that he did "not intend for this

---

[1] Unless otherwise noted, the facts set forth herein are undisputed and drawn from the parties' Statements of Undisputed Material Facts submitted pursuant to Local Civil Rule 7(h).

letter to serve as a limitation to access to other pages of the FBI's larger collection of materials on Peoples Temple." Id. Between July 1 and July 5, 1999, Plaintiff Moore submitted five further FOIA requests to the FBI regarding the Jonestown Massacre.

On May 24, 2000, the FBI sent Plaintiffs three CD-ROMs containing the 48,738 pre-processed pages referenced in its November 23 letter. These pages did not contain a list of victims. However, the FBI maintains that these pages encompass all disclosable pages it possesses relating to Jonestown.

By letters dated May 30, 2000, and July 2, 2000, McGehee filed an appeal with the Department of Justice's Office of Information Policy ("OIP"), challenging FBI redactions within the pages produced. By letter dated August 29, 2000, OIP informed McGehee that a supplemental release of two pages would be made, but otherwise affirmed the redactions.

On August 30, 2001, Plaintiffs filed their first Complaint [Dkt. No. 1], seeking an order requiring Defendant to provide the information sought. On June 6, 2003, Judge John G. Penn, then presiding over this case, granted Plaintiffs' Motion for Leave to File an Amended Complaint [Dkt. No. 29]. Plaintiffs' Amended Complaint covered additional FOIA requests made to the FBI regarding the Jonestown Massacre. Thereafter, the parties spent several years negotiating in an effort to resolve this matter, during which time Defendant made certain additional searches and

productions. The case was transferred to this Court on October 25, 2007 [Dkt. No. 80].

On July 2, 2009, after further negotiations between the parties, Plaintiffs provided the FBI with a list of 105 documents, comprising 424 pages, to serve as a representative sample for which the FBI would provide justification of their redactions pursuant to Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974). On November 2, 2009, the FBI filed its first Vaughn Index, but agreed to conduct a new declassification review of the classified material within the original 48,738 pages. On June 29, 2010, the FBI filed an updated Vaughn Index (the "Vaughn Index") [Dkt. Nos. 124, 125]. This Index reflected that the FBI had, upon review of the sample, released 36 pages in full, 234 pages in part, and withheld 157 pages in full.[2]

On August 2, 2010, Defendant filed the present Motion for Summary Judgment [Dkt. No. 126]. On September 22, 2010, Plaintiffs filed their Opposition and Cross-Motion for Summary Judgment [Dkt. No. 132]. On March 25, 2011, Defendant filed its Reply to Plaintiffs' Opposition and Opposition to Plaintiffs' Cross-Motion

_____

[2] Because three pages from the original 424-page sample submitted by McGehee were subsequently released in full as a result of further declassification review, McGehee was permitted to choose three replacement pages for the sample. Supp. Hardy Decl. ¶ 39. Hence, the Vaughn Index reflects review of a total of 427 pages. Id.

for Summary Judgment [Dkt. No. 140]. On May 6, 2011, Plaintiffs filed their Reply to Defendant's Opposition [Dkt. No. 147].

## II. STANDARD OF REVIEW

FOIA "requires agencies to comply with requests to make their records available to the public, unless the requested records fall within one or more of nine categories of exempt material." Oglesby v. United States Dep't of the Army, 79 F.3d 1172, 1176 (D.C. Cir. 1996) (citing 5 U.S.C. §§ 552(a), (b)). An agency that withholds information pursuant to a FOIA exemption bears the burden of justifying its decision, Petroleum Info. Corp. v. Dep't of the Interior, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (citing 5 U.S.C. § 552(a)(4)(B)), and must submit an index of all materials withheld. Vaughn, 484 F.2d at 827-28. In determining whether an agency has properly withheld requested documents under a FOIA exemption, the district court conducts a de novo review of the agency's decision. 5 U.S.C. § 552(a)(4)(B).

FOIA cases are typically and appropriately decided on motions for summary judgment. Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys., 762 F. Supp. 2d 123, 130 (D.D.C. 2011); Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). Summary judgment will be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c).

In a FOIA case, the court may award summary judgment solely on the basis of information provided in affidavits or declarations when they (1) "describe the documents and the justifications for nondisclosure with reasonably specific detail;" (2) "demonstrate that the information withheld logically falls within the claimed exemption;" and (3) "are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." <u>Military Audit Project v. Casey</u>, 656 F.2d 724, 738 (D.C. Cir. 1981). Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" <u>SafeCard Servs., Inc. v. Sec. & Exch. Comm'n</u>, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting <u>Ground Saucer Watch, Inc. v. Cent. Intelligence Agency</u>, 692 F.2d 770, 771 (D.C. Cir. 1981)).

## III. ANALYSIS

### A.    Adequacy of the Search

Plaintiffs first make several specific challenges to the adequacy of Defendant's search. Pls.' Opp'n 15-16. To demonstrate that a search was adequate, the agency must demonstrate that its search was "reasonably calculated to uncover all relevant documents." <u>Weisberg v. United States Dep't of Justice</u>, 705 F.2d 1344, 1351 (D.C. Cir. 1983). The agency must "show that it made a

good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Oglesby v. United States Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990). There is no requirement that an agency search every record system in which responsive documents might conceivably be found. Nation Magazine v. United States Customs Serv., 71 F.3d 885, 892 (D.C. Cir. 1995). However, the agency cannot limit its search to only one record system if there are others that are likely to produce the information requested. Id. at 892.

The adequacy of any FOIA search is measured by a standard of "reasonableness" and is dependent on the circumstances of the case. Schrecker v. United States Dep't of Justice, 349 F.3d 657, 663 (D.C. Cir. 2003). The adequacy of a search is not determined by its results, but by the method used to conduct the search itself. Weisberg v. United States Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984). To show reasonableness at the summary judgment phase and to allow the court to determine if the search was adequate, an agency must provide a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." Oglesby, 920 F.2d at 68.

In response to Plaintiffs' request for "all lists of the people who died in Jonestown," the FBI searched its Central Records

System ("CRS") and Automated Case Support System ("ACS") for "Jonestown deaths, "Jonestown list," and "Jonestown Casualties." Def.'s Mot. 34. These searches produced no results. Id.

However, a search for "Jonestown" produced the "RYMUR" file—the criminal investigatory file for the investigation into the assassination of Congressman Ryan. Id.; Supp. Hardy Decl. ¶ 47 [Dkt. No. 124]. This file was determined to be the only file related to the FBI's investigation into Jonestown and contained the 48,738 pages produced to Plaintiffs. Supp. Hardy Decl. ¶¶ 48-50. In response to Plaintiffs' further FOIA requests, the FBI also searched its ACS Universal Index "using each subject's name to locate any main investigatory files maintained at FBIHQ." Id. at ¶ 51. The FBI used "each subject's name and included a six way phonetic breakdown of the subject's first, middle, and last name, in addition to a basic search using the exact spelling of the name provided by the plaintiff."[3] Id.

Plaintiffs argue that the FBI's search was deficient for several reasons. First, Plaintiffs argue that Defendant's description of the FBI's search "is inadequate, consisting simply of general statements that it conducted a search of 12 subjects of the several requests and found no 'main' files." Pls.' Opp'n 16. To the contrary, Defendant's affidavit explains precisely what

_____

[3] The "subjects" are the individuals about whom Plaintiffs sought information in their additional FOIA requests. See Supp. Hardy Decl. ¶ 51.

searches it conducted and the databases searched. It constitutes a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." Oglesby, 920 F.2d at 68. Further, the FBI's search picked up not only "main" files but also "cross-references," which are documents "in an FBI file on another subject of an investigation in which the subject of the FOIA request is merely mentioned or referred to, but in which he/she is not the main subject of the investigation." Eighth Hardy Decl. ¶ 52 [Dkt. No. 142-11].

Second, Plaintiffs argue that it is "implausible" that "there was no separate file on the FBI's investigation of [Larry Layton[]]"—the subject of one of Plaintiffs' later FOIA requests. Pls.' Opp'n 16. As the FBI has explained, however, Larry Layton was tried and convicted "for acts relating to the assassination in Jonestown." Eighth Hardy Decl. ¶ 53. Hence, documents relating to Layton would be in the RYMUR file, and, in fact, "Larry Layton is listed as a main subject of the RYMUR file." Id.

Finally, Plaintiffs argue that a number of attachments to documents are missing from the three CD-ROMs sent by the FBI. Pls.' Opp'n 16. Defendant insists that "[m]any of the items alleged to be missing were never listed as enclosures or attachments to the document filed in this file, [the three CD-ROMs,] but were only

noted as attachments or enclosures to the offices listed in the copy counts," and that "[o]ther items were accounted for with a deleted page information sheet or provided in another location in the file." Def.'s Reply 7; Eighth Hardy Decl. ¶ 4. In any case, these missing attachments, in the context of the FBI's search and the size of its production, are not sufficient to render the FBI's search inadequate. See Nation Magazine, 71 F.3d at 892 n.7 ("the failure to turn up . . . [a] document does not alone render the search inadequate; there is no requirement that an agency produce all responsive documents.") (emphasis in original).

In sum, Defendant has submitted reasonably detailed affidavits demonstrating that its search was "reasonably calculated to uncover all relevant documents." Weisberg, 705 F.2d at 1351.

## B.    Exemption 3

Defendant argues that it properly withheld information pursuant to Exemption 3, which protects records that are "specifically exempted from disclosure by statute ... provided that such statute either . . . [requires withholding] in such a manner as to leave no discretion on the issue, or . . . establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3).

When faced with an Exemption 3 defense to a FOIA claim, district courts engage in the two-pronged inquiry identified in Irons & Sears v. Dann, 606 F.2d 1215, 1220 (D.C. Cir. 1979), cert.

_denied_, 444 U.S. 1075, 100 S.Ct. 1021, 62 L.Ed.2d 757 (1980).
First, the Court must determine whether the statute qualifies as an
Exemption 3 statute. Second, the Court must determine "whether the
information sought after falls within the boundaries of the
non-disclosure statute." _Id._ Defendant cites two statutes that
justify withholding under Exemption 3. Each will be addressed in
turn.

### 1.    Federal Rule of Criminal Procedure 6(e)

Defendant first argues that certain information must be
withheld because it relates to a grand jury investigation. The
Federal Rules of Criminal Procedure prohibit disclosure of "matters
occurring before [a] grand jury." Fed. R. Crim. P. 6(e)(2); see In
re Motions of Dow Jones & Co., Inc., 142 F.3d 496, 498-501 (D.C.
Cir. 1998), cert. denied sub nom. Dow Jones & Co., Inc. v. Clinton,
525 U.S. 820, 119 S.Ct. 60, 142 L.Ed.2d 47 (1998). Rule 6(e) is a
statute for purposes of Exemption 3 because Congress affirmatively
enacted it. See Fund for Constitutional Gov't v. Nat'l Archives and
Records Serv., 656 F.2d 856, 867-68 (D.C. Cir. 1981).

In this Circuit, the grand jury exception is limited to
material which, if disclosed, would "tend to reveal some secret
aspect of the grand jury's investigation, such . . . as the
identities of witnesses or jurors, the substance of testimony, the
strategy or direction of the investigation, the deliberations or
questions of jurors, and the like." Senate of the Commonwealth of

<u>Puerto Rico v. United States Dep't of Justice</u>, 823 F.2d 574, 582 (D.C. Cir. 1987).

Here, the FBI invoked Exemption 3 in conjunction with Rule 6(e) only as to "Federal Grand Jury subpoenas, as well as the names and identifying information of individuals subpoenaed to testify before the Federal Grand Jury and information that identifies specific records subpoenaed by the Federal Grand Jury." Supp. Hardy Decl. ¶ 76. Plaintiffs make no response to this statement, other than generally to request <u>in camera</u> inspection of the withheld documents. <u>See</u> Pls.' Opp'n 16-21.

Given that the information withheld plainly implicated "the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like," Defendant properly invoked Exemption 3 in conjunction with Rule 6(e). <u>Senate of the Commonwealth of Puerto Rico</u>, 823 F.2d at 582. Hence, no <u>in camera</u> inspection is necessary. <u>Larson v. Dep't of State</u>, 565 F.3d 857, 870 (D.C. Cir. 2009) (If the agency's affidavits 'provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without in camera review of the documents.'") (quoting <u>Hayden v. Nat'l Sec. Agency</u>, 608 F.2d 1381, 1387 (D.C. Cir. 1987)); <u>Am. Civil Liberties Union v. United States</u>

Dep't of Defense, 628 F.3d 612, 626 (D.C. Cir. 2011) ("a court should not resort to [in camera inspection] routinely on the theory that 'it can't hurt.'") (citing Larson, 565 F.3d at 870).

## 2. 50 U.S.C. § 403

Defendant explains that certain information was withheld on behalf of the CIA because that information "relates to the organization, its functions, names, official titles, salaries and numbers of personnel employed by the agency." Supp. Hardy Decl. ¶ 77. Defendant cites to two statutes that justify this withholding. First, pursuant to the National Security Act of 1947 ("NSA"), the "Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1). Second, Section 6 of the Central Intelligence Agency Act of 1949 ("CIA Act") exempts the CIA from "any ... law which require[s] the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the [CIA]." 50 U.S.C. § 403g.

There is no question that both statutes cited by Defendant are "precisely the type of statutes comprehended by exemption 3." Goland v. Cent. Intelligence Agency, 607 F.2d 339, 349 (D.C. Cir. 1978) (internal quotations omitted); Larson, 565 F.3d at 865 ("There is thus no doubt that section 403(d)(3) [now section 403-1(i)(1)] is a proper exemption statute under exemption 3.") (bracketed language in original) (quoting Fitzgibbon v. Cent.

Intelligence Agency, 911 F.2d 755, 861 (D.C. Cir. 1990); Halperin v. Cent. Intelligence Agency, 629 F.2d 144, 147 (D.C. Cir. 1980) ("Section 403g further provides for the exemption of the CIA from any law that requires disclosure of the organization functions, names, official titles, salaries or numbers of personnel employed by the Agency.").

Ralph S. DiMaio, the Information Review Officer for the National Clandestine Service of the CIA, has provided a declaration stating that the CIA has withheld "information relating to its functions, foremost of which is the collection of foreign intelligence through intelligence sources and methods, as well as the names of CIA employees, and organizational data, including location of facilities, file numbers and dissemination controls and markings." DiMaio Decl. ¶ 27 [Dkt. No. 126-1]. According to DiMaio, "[t]he CIA has withheld this information to prevent the publication of CIA personnel, structure, organization, and procedures, which could be used as a tool for hostile penetration or manipulation." Id. Plaintiffs reply that "there must be some limit on [using 50 U.S.C. § 403-1(i)(1)] which relates to a practical assessment of current actual national security needs" and that the Court should permit an in camera inspection. Pls.' Reply 9-10. "Given the special deference owed to agency affidavits on national security matters," Defendant properly invoked Exemption 3 in conjunction

with 50 U.S.C. § 403. <u>Morley v. Cent. Intelligence Agency</u>, 508 F.3d 1108, 1126 (D.C. Cir. 2007).

### C. **Exemptions 6 and 7(C)[4]**

Defendant contends that a substantial portion of the withheld documents are protected from disclosure by Exemption 7(C), which protects information compiled for law enforcement purposes to the extent that disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 522(b)(7)(C). In determining whether Exemption 7(C) applies, the Court must balance the public interest in disclosure with the privacy interests implicated by release of the material. <u>Computer Prof'ls for Soc. Responsibility v. United States Secret Serv.</u>, 72 F.3d 897, 904 (D.C. Cir. 1996). Suspects, witnesses, investigators, and third parties all have substantial privacy interests that are implicated by the public release of law enforcement investigative materials. <u>Id.</u>; <u>Davis v. United States Dep't of Justice</u>, 968 F.2d 1276, 1281 (D.C. Cir. 1992). Disclosure of these materials can lead to great embarrassment and reputational harm for these individuals. <u>Safecard</u>, 926 F.2d at 1205. Indeed, disclosure could, in some cases, lead to physical harm as well.

---

[4] Because the FBI asserted Exemption 6 coextensively with Exemption 7(C) and, as explained in this section, the information sought was properly withheld under Section 7(C), there is no need to address the more stringent standards of Exemption 6.

Moreover, it "is well established that the only public interest relevant for purposes of Exemption 7(C) is one that focuses on the citizens' right to be informed about what their government is up to." Davis, 968 F.2d at 1282 (internal quotations omitted). Whether disclosure of private information is warranted under Exemption 7(C) turns upon whether the information "sheds light on an agency's performance of its statutory duties." Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 759, 773, 109 S.Ct. 1468, 1482, 103 L.Ed.2d 774 (1989). Thus, the requested information must shed light on the agency's own conduct and not merely on the subject matter of the underlying law enforcement investigation. Id. Our Court of Appeals has held "categorically that, unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure."[5] Safecard, 926 F.2d at 1206.

The FBI has asserted Exemption 7(C) "to protect names and/or identifying information of: 1) Third Parties Merely Mentioned; 2) Third Parties who Provided Information; 3) FBI Agents and Support Personnel; 4) Non-FBI Federal Government Personnel; 5) Local and/or

---

[5] Plaintiffs do not present any evidence, no less compelling evidence, that the FBI has engaged in illegal activity-at least as to the facts of this case.

State Government Employees; 6) Third Parties of Investigative Interest; and 7) Victims and Survivors of Jonestown." Def.'s Mot. 23. Defendant argues that the release of this information "would not shed any light on how the FBI performed its statutory investigative duties" but "could reasonably be expected to cause harassment, embarrassment and/or unsolicited publicity which would clearly constitute an unwarranted invasion of their privacy." Id. at 24.

Although Plaintiffs make a number of speculative arguments relating to specific redacted documents, they argue essentially that the interest in disclosure is particularly high in this case due to "the depth and extent of the public interest in the Jonestown records."[6] Pls.' Opp'n 24. Plaintiffs further argue that

---

[6] In their Reply, Plaintiffs also argue that there should be no privacy interest in information that was once published in a newspaper, even if that information is now difficult or impossible to find. Pls.' Reply 14-17. Plaintiffs contend that the notion of "practical obscurity" is improperly drawn from the holding in Reporters Comm. for Freedom of the Press, 489 U.S. 759, because the holding in that case was limited to computerized rap sheets. Pls.' Reply 15-17.

Plaintiffs' reading of Reporters Comm. for Freedom of the Press is too cramped. As the Supreme Court stated, "the issue here is whether the compilation of otherwise hard-to-obtain information alters the privacy interest implicated by disclosure of that information." Reporters Comm. for Freedom of the Press, 489 U.S. at 764. The Supreme Court acknowledged "the privacy interest inherent in the nondisclosure of certain information even where the information may have been at one time public." Id. at 767. Finally, the Supreme Court concluded that "the fact that an event is not wholly 'private' does not mean that an individual has no interest in limiting disclosure or dissemination of the information." Id. at 770 (internal quotation omitted).

the identity of a person involved in the investigation into the Jonestown Massacre "tells who the FBI thought relevant and pertinent to its investigation" and "enables a requester to link together various statements and evaluate the reliability of this and other witnesses." Pls.' Reply 13. For this reason, Plaintiffs contend that they cannot compile an accurate historical record without knowing all relevant identities. Id.

Although the Jonestown Massacre may have elicited a great deal of public attention, the relevant question is not whether the public would like to know the names of FBI agents and victims involved, but whether knowing those names would shed light on the FBI's performance of its statutory duties. Reporters Comm. for Freedom of the Press, 489 U.S. at 773. Plaintiffs have failed to convincingly explain how knowing the names of the persons involved would achieve that goal. Fitzgibbon, 911 F.2d at 768 ("there is no reasonably conceivable way in which the release of the one

_____

Our Court of Appeals has acknowledged the Supreme Court's holding, observing that Reporters Comm. for Freedom of the Press "does cast doubt on the proposition that, simply because material has been made public at one time, it should be thought permanently in the public domain, even though it has since become 'practical[ly] obscur[e].'" Davis, 968 F.2d at 1279 (quoting Reporters Comm. for Freedom of the Press, 489 U.S. at 762-71). In Davis, the Court of Appeals held that the plaintiff "has the burden of showing that there is a permanent public record of the exact portions" he or she believes should not be withheld because they are in the public domain. 968 F.2d at 1280. Thus, it is clear that in our Circuit a privacy interest may be implicated by "practically obscure" information. Reporters Comm. for Freedom of the Press 489 U.S. at 764.

individual's name . . . would allow citizens to know what their government is up to.") (internal quotations omitted).

Thus, after balancing the privacy interests implicated by these documents against the public interest in their disclosure, the Court concludes that the FBI properly withheld this information under Exemption 7(C).

### D.    Exemption 7(D)

Defendant asserts that certain information is protected by Exemption 7(D), which exempts from disclosure information that

> could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D).

To invoke Exemption 7(D), an agency must show either that a source provided the information to the agency under express assurances of confidentiality or that the circumstances support an inference of confidentiality. United States Dep't of Justice v. Landano, 508 U.S. 165, 179-81, 113 S.Ct. 2014, 2023-24, 124 L.Ed.2d 84 (1993). When determining the existence of an implied assurance of confidentiality, the government is not entitled to a presumption that all sources supplying information in the course of a criminal investigation are confidential sources. Id. at 181. Such an

assurance can be inferred, however, by the nature of the criminal investigation and the informant's relationship to it. Id. "A source should be deemed confidential if the source furnished information with the understanding that [the law enforcement agency] would not divulge the communication except to the extent . . . necessary for law enforcement purposes." Id. at 174.

Defendant asserts that the FBI received information from individuals who were given an express assurance of confidentiality as well as from individuals who were given an implied assurance of confidentiality. Def.'s Mot. 27-28. Specifically, Defendant claims that two witnesses were given express assurances of confidentiality. The first "related that he/she had received threats to his/her safety if they were to reveal any information concerning the People's [sic] Temple to law enforcement." Supp. Hardy Decl. ¶ 100. Further, documents relating to this individual bore the words "protect identity" and "confidential source." Id. Documents relating to the second individual bore the words "In confidence." Id. at 101.

Plaintiffs argue that this evidence is insufficient to demonstrate an express assurance of confidentiality. Plaintiffs contend that the declarant had no personal knowledge of what assurances were given and that the phrases "protect identity," "confidential source," and "In confidence" "may have been based on an FBI agent's misunderstanding of the circumstances . . . or were

simply part of a bureaucratic routine engaged in by FBI agents regardless of whether an express pledge of confidentiality was either asked for or received." Pls.' Opp'n 41-42.

Plaintiffs' claims are simply too speculative to overcome the presumption of good faith accorded Defendant's affidavit. SafeCard, 926 F.2d at 1200. Plaintiffs have offered no specific reason–other than pure speculation–to cast doubt on the fact that these two sources were expressly assured that they would remain confidential. See Campbell v. United States Dep't of Justice, 164 F.3d 20, 34 (D.C. Cir. 1998) (evidence of an express grant of confidentiality "can take a wide variety of forms, including notations on the face of a withheld document, the personal knowledge of an official familiar with the source, a statement by the source, or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources.").

Defendant also argues that other individuals gave the FBI information under an implied assurance of confidentiality. The FBI explains that "based on the violent nature of the crime and the events related by the third parties and because of the third parties['] relationships to the crime, it can be inferred from the information provided that . . . there was an expectation of privacy." Supp. Hardy Decl. ¶ 102.

Plaintiffs offer two responses. First, they state that "[w]hile there was a general fear of reprisals after Jonestown,

they were generated in the heat of the moment and never materialized." Pls.' Opp'n 43. Hence, Plaintiffs argue that because the informants' fear of danger may have subsided, they no longer are entitled to an implied promise of confidentiality. Second, Plaintiffs contend that "the circumstances of at least some of the interviews raise questions about the validity of any confidentiality agreement because they were carried out under conditions suggesting duress." Id.

Plaintiffs point to no authority for the claim that a source can lose its implied assurance of confidentiality if and when it subsequently becomes less afraid of reprisal. To the contrary, if the agency "can demonstrate that the information was provided in confidence at the time it was communicated to the FBI . . . the source will be deemed a confidential one, and both the identity of the source and the information he or she provided will be immune from FOIA disclosure." Dow Jones & Co., Inc. v. Dep't of Justice, 917 F.2d 571, 575-76 (D.C. Cir. 1990) (internal quotations omitted). Further, Plaintiffs offer no specific facts to suggest that the confidentiality agreements were a result of duress. In sum, their claim of duress is entirely speculative and unpersuasive.

Once the agency has demonstrated that the withheld information was given by a confidential informant, no balancing test is necessary. Boyd v. Criminal Div. of United States Dep't of Justice,

475 F.3d 381, 390 (D.C. Cir. 2007). Therefore, the FBI properly withheld information under Exemption 7(D).[7]

## E.    Exemption 7(E)

Finally, Defendant asserts that certain information is properly withheld pursuant to Exemption 7(E). Exemption 7(E) protects from disclosure law enforcement records "to the extent that the production of such law enforcement records or information ... would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

Information pertaining to law enforcement techniques and procedures is properly withheld under Exemption 7(E) where disclosure reasonably could lead to circumvention of laws or regulations. See, e.g., Morley v. Cent. Intelligence Agency, 453 F. Supp. 2d 137, 156 (D.D.C. 2006) (withholding information pertaining

_____

[7] Plaintiffs also argue that "the FBI has not indicated whether any of its alleged confidential sources testified at Layton's trial," which would waive confidentiality, and that the "FBI does disclose Permanent Source Symbol Numbers on occasion, particularly if the informant is deceased or has been publicly revealed." Pls.' Opp'n 44. Neither argument is convincing. See Davis, 968 F.2d at 1281 ("Even when the source testifies in open court . . . he does not thereby waive the [government's] right to invoke Exemption 7(D) to withhold . . . information furnished by a confidential source not actually revealed in public.") (internal quotations omitted); Campbell, 165 F.3d at 34 n.14 ("Death of a confidential source . . . is not relevant under exemption 7(D).").

to security clearances and background investigations on the ground that "disclosure of CIA security clearance and investigatory processes would risk circumvention of those processes in the future"); Piper v. United States Dep't. of Justice, 294 F. Supp. 2d 16, 30 (D.D.C. 2003) (withholding polygraph test information on the ground that disclosure "has the potential to allow a cunning criminal to extrapolate a pattern or method to the FBI's questioning technique," and anticipate or thwart FBI's strategy); Fisher v. United States Dep't of Justice, 772 F. Supp. 7, 12 (D.D.C. 1991) (upholding FBI's decision to withhold information about law enforcement techniques where disclosure would impair effectiveness and, within context of documents, "could alert subjects in drug investigations about techniques used to aid the FBI"), aff'd, 968 F.2d 92 (D.C. Cir. 1992).

The FBI seeks to protect information regarding "the type of Stop Notice placed on certain survivors/victims." Def.'s Mot. 31. The FBI explains that the "placement of Stops through the Immigration and Naturalization Service (now Immigration and Customs Enforcement, Department of Homeland Security) is a technique utilized by the FBI to obtain information concerning the movement of individuals of interest." Supp. Hardy Decl. ¶ 107. Because the "decision of what type of stop to place with a particular agency, such as INS, reflects what information the FBI is interested in," "[r]elease of the types of stops could allow individuals to

circumvent the law by avoiding discovery if they are aware of what action the FBI is requesting from an agency by the placement of a particular type of Stop." Id.

Plaintiffs argue that the FBI has failed to "allege that this technique is generally unknown to the public" and has "set[] forward no facts which would support a contention that [the risk of circumvention of the law] could reasonably be expected to occur." Pls.' Opp'n 45. However, Exemption 7(E) may be used to protect information where disclosure reasonably could lead to circumvention of laws or regulations even where the existence of the general technique is known to the public. See, e.g., Lewis-Bey v. United States Dep't of Justice, 595 F. Supp. 2d 120, 138 (D.D.C. 2009) (withholding the circumstances, timing, and location of electronic surveillance); Piper, 294 F. Supp. 2d at 30 (withholding polygraph test information). In sum, Exemption 7(E) does not require that the general technique be unknown to the public.

Because "[r]elease of the types of stops could allow individuals to circumvent the law by avoiding discovery if they are aware of what action the FBI is requesting from an agency by the placement of a particular type of Stop," the FBI properly withheld information pursuant to Exemption 7(E).

### F. Adequacy of the Vaughn Index and Segregability

Plaintiffs also challenge the adequacy of Defendant's Vaughn Index. They argue that the "index submitted in this case contains

numerous and pervasive flaws," including failure to adequately describe the content of what was withheld and failure to sufficiently describe which exemptions the FBI has relied upon for which portions of withheld information. Pls.' Opp'n 47.

In Vaughn v. Rosen, the Court of Appeals held that an agency's response to a FOIA request must include an index of all material withheld in whole or in part. 484 F.2d 820. This index must identify the material withheld and the statutory exemptions claimed as justification for such withholding with sufficient detail "'to permit adequate adversary testing of the agency's claimed right to an exemption,' and to enable 'the District Court to make a rational decision whether the withheld material must be produced without actually viewing the documents themselves, as well as to produce a record that will render the District Court's decision capable of meaningful review on appeal.'" King v. United States Dep't of Justice, 830 F.2d 210, 219 (D.C. Cir. 1987) (quoting NTEU v. United States Customs Serv., 802 F.2d 525, 527 (D.C. Cir. 1986) and Dellums v. Powell, 642 F.2d 1351, 1360 (D.C. Cir. 1980)). However, the precise form of the Vaughn Index is immaterial; nor is the index's sufficiency determined by the length of its document descriptions. Judicial Watch, Inc. v. Food & Drug Admin., 449 F.3d 141, 146 (D.C. Cir. 2006). "Specificity is the defining requirement of the Vaughn index and affidavit." King, 830 F.2d 210, 219 (D.C. Cir. 1987).

The form of Defendant's "Vaughn Index" is twofold: Defendant has submitted (1) multiple lengthy affidavits explaining why certain exemptions are invoked, and (2) the entirety of the 427-page sample with Exemptions listed beside redactions or on "Deleted Page Information Sheets." Although these documents do provide a great deal of detail, many are missing critical information. In particular, the Deleted Page Information Sheets contain absolutely no information as to the author, date, contents, or recipients of the missing pages. See Hussain v. United States Dep't of Homeland Sec., 674 F. Supp. 2d 260, 267 (D.D.C. 2009) (details "such as the date, author or recipient of the document" are "often necessary 'to enable the court and opposing party to understand the withheld information in order to address the merits of the claimed exemptions.'") (quoting Judicial Watch, 449 F.3d at 150); Defenders of Wildlife, 623 F. Supp. 2d at 88 (D.D.C. 2009) (same). Similarly, although it is often obvious from the context that redactions included the names of individuals, in many instances it is entirely unclear what substantive information was redacted. See, e.g., Vaughn Index, Ex. U, at Jonestown-11, Jonestown-22, Jonestown-29, Jonestown-30.

Even if a record contains information that is exempt from disclosure, any reasonably segregable information must be released after deleting the exempt portions, unless the non-exempt portions are inextricably intertwined with exempt portions. 5 U.S.C. §

552(b); Trans-Pac. Policing Agreement v. United States Customs
Serv., 177 F.3d 1022, 1026-27 (D.C. Cir. 1999). A district court
has an affirmative duty to consider the issue of segregability sua
sponte and the failure to make express findings on segregability
constitutes reversible error. Morley, 508 F.3d at 1123.

Critically, "[i]n order to demonstrate that all reasonably
segregable material has been released, the agency must provide a
'detailed justification' for its non-segregability." Johnson v.
Exec. Office for U.S. Attorneys, 310 F.3d 771, 776 (D.C. Cir. 2002)
(quoting Mead Data Cent., Inc. v. United States Dep't of the Air
Force, 566 F.2d 242, 261 (D.C. Cir. 1977)). A "blanket declaration"
that documents do not contain segregable material is insufficient.
Wilderness Soc. v. United States Dep't of Interior, 344 F. Supp. 2d
1, 19 (D.D.C. 2004).

Although the Court was able to determine the propriety of the
asserted Exemptions based upon the Defendant's affidavits, the
failure of the Vaughn Index to provide any specific information
regarding the missing pages and numerous redactions renders it
impossible to evaluate the FBI's conclusions that the pages
included no segregable portions. See Johnson, 310 F.2d at 776;
Defenders of Wildlife, 623 F. Supp. 2d at 90. Therefore,
Defendant's Vaughn Index is deficient and must be supplemented.

Further, Defendant's declarant's statement that "[e]very
effort was made to provide plaintiff with all material in the

public domain and with all reasonably segregable portions of releasable material" falls far short of the specificity required to justify non-segregation. Johnson, 310 F.2d at 776. Therefore, Defendant has not carried its burden of demonstrating that all segregable information has been disclosed.

### G.    Exemptions 1 and 2 and Pending Sealing Order

Defendant states that it "will no longer defend its use of what was previously referred to as the 'high' (b)(2) exemption" and that "it must adjust its declaration and supporting exhibits with regard to its claims under FOIA exemption (b)(1)." Def.'s Reply 1-2. Accordingly, Defendant will reprocess its entire production and file supplemental briefing regarding Exemptions 1 and 2. Id. Additionally, Defendant states that it has sent a formal request to the Los Angeles County Police Department seeking its consent to the lifting of a sealing order which, up until now, Defendant has cited as precluding the release of certain information. Id. at 3. Once again, "[t]he FBI intends to supplement its filing on this issue at a later date." Id. For these reasons, the Court will not address those Exemptions at this time.[8]

---

[8] In its Reply, Defendant indicates its intention to consider asserting additional exemptions when reprocessing this material. Def.'s Reply 2. Our Court of Appeals has made plain that "as a general rule, [the Government] must assert all exemptions at the same time, in the original court proceedings." Maydak v. United States Dep't of Justice, 218 F.3d 760, 764 (D.C. Cir. 2000). Although the proceedings before this Court have not fully concluded, "there may be circumstances in which withdrawal of an agency's prime exemption claim should preclude the agency's fresh

However, the Court has noted Plaintiffs' concern over the time Defendant has indicated it will take to reprocess its production. See Pls.' Reply 1-4. The Court acknowledges the burdens on the FBI, but believes the one-year estimate to be unreasonable for the following reasons. First, this Memorandum Opinion and its accompanying Order have substantially decreased the amount of work to be done by the FBI in this matter. Second, the FBI does not, as it contends, have to "reprocess the entire roughly 48,738 pages of response material." Def.'s Reply 1. As Plaintiffs point out, approximately 35,000 pages have been released in full, leaving approximately 14,000 pages to be reviewed. Id. at 2-3. Of these 14,000 pages containing redactions or withheld in full, the vast majority were withheld on the basis of Exemption 6 and 7(C), and

---

assertion of additional exemptions." Senate of the Commonwealth of Puerto Rico, 823 F.2d at 580; see also Ryan v. United States Dep't of Justice, 617 F.2d 781, 792 (D.C. Cir. 1980) (warning of the "danger of permitting the Government to raise its FOIA exemption claims one at a time, at different stages of a district court proceeding").

Now, eleven years after sending Plaintiffs the original pre-processed material, Defendant suggests that it will use its own withdrawal of Exemption 2 claims as an opportunity to drum up new exemptions. Permitting the Government to raise new exemptions at this stage would undermine "the interest in judicial finality and economy, which has 'special force in the FOIA context, because the statutory goals--efficient, prompt, and full disclosure of information--can be frustrated by agency actions that operate to delay the ultimate resolution of the disclosure request.'" August v. Fed. Bureau of Investigation, 328 F.3d 697, 699 (D.C. Cir. 2003) (quoting Senate of the Commonwealth of Puerto Rico, 823 F.2d at 580). Therefore, the Court will not consider new exemptions raised by Defendant at this late point in the litigation.

therefore do not need to be reviewed for withholding under other exemptions. <u>Id.</u> at 3. Hence, the number of pages the FBI needs to review is in reality a far cry from the 48,738 it claims. Based on this information, the Court would expect that the FBI could complete its reexamination within six months, at which time it could also submit an adequate <u>Vaughn</u> Index.

**IV.  CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment is **granted in part** and **denied in part** and Plaintiffs' Motion for Summary Judgment is **granted in part** and **denied in part**. Defendant must file an updated <u>Vaughn</u> Index in conformity with this Memorandum Opinion when it completes its reevaluation of documents previously withheld under Exemptions 1 and 2 and the sealing order. An Order shall accompany this Memorandum Opinion.


August 5, 2011                        /s/_____
                                      Gladys Kessler
                                      United States District Judge


**Copies to: Attorneys of record via ECF**